## ATKINS v. W. A. HARRIMAN & CO., Inc.
### No. 166.

Circuit Court of Appeals, Second Circuit.
Feb. 13, 1934.

Peaslee & Brigham, of New York City (Edward P. Marshall, of Tulsa, Okl., and Dexter Brigham, of New York City, of counsel), for appellant.

O'Brien, Boardman, Conboy, Memhard & Early, of New York City (John Vance Hewitt and Bernard Sobol, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The suit was by bill in equity to set aside two contracts, together constituting an accord and satisfaction and settling the accounts of the parties arising from the following facts: In 1928 the plaintiff, an accountant, brought to the attention of the defendant, a banking corporation, an industrial company, the S. R. Dresser Mfg. Co., as a good possible investment. The parties agreed that if the defendant got all the shares of the Dresser Company, it would "re-organize" it, a euphemism for watering its stock, and that they should divide the profit on the sale of the new shares. The plaintiff was to get one-fifth of the "originating profit," defined as the difference between the price paid by the defendant (or as the plaintiff insists, by a "purchasing group" made up of the defendant and himself), and that price which the underwriters of the issue, the "banking group," were to guarantee. In this, as generally in such undertakings, there was to be a third class, the "selling group," buying the shares at a higher price than that guaranteed and selling to the public at a still higher. Each of these two classes would find a profit in the "spread" between the price at which it got the shares and that at which it passed them on. The defendant was to be free to take as many shares as it wished as a member of the "banking" and "selling" groups; the price to the "banking group" was to be $44.-50. So far as the shares were not sold under "banking group" guarantee, but the defendant sold them outside, the actual profit was to be the basis of the settlement.

The defendant did get all the Dresser shares and began the flotation of a new issue in November and December, 1928. 100,000 A-shares and a like number of B-shares were to be issued at once; the A-shares were offered to the "banking group" at $44.50 as agreed, and to the "selling group" at $46, which was to sell to its customers at $48; the market was to be maintained for six months at the expense of the "banking group." The offering did not prove very attractive; subscriptions by the "banking group" amounted by the end of December to only 20,700 A-shares. On the defendant's books a subscription of 40,000 shares was entered, to which was added by a special arrangement 12,000 taken up by one Carl Dresser, one of the former shareholders. Besides these, other former shareholders subscribed for 6,900 shares and the "selling group" took 3,925 more without previous underwriting. Thus by the end of December, 1928, 83,525 had been subscribed, if the defendant's subscription be included; and as by February 5, 6,500 more were added, on February 19, 1929, the score was 90,025 all told.

Meanwhile the plaintiff had decided to anticipate his share in the venture if he could, and asked a present settlement though the time had not yet come for it. After some preliminary negotiations the parties came to an agreement on February 19, 1929. The defendant stated that the cost of the shares had been $3,934,000, including a deposit of $38,-000 to protect the old shareholders against their income taxes. Against this it declared that it had sold 66,433 shares at $44.50, amounting to $2,956,000; 33,567 shares remained which for the purposes of the settlement it took at $40. This made a total of $4,298,000 and a profit of $364,000 of which the plaintiff's share was about $73,000. He was to take this in 1,838 A-shares at $44.50.

The defendant had also been selling B-shares, all of whose proceeds were profit. These amounted to $472,000, of which the plaintiff's share was $94,000, which was similarly to be converted into 2,122 shares of A-stock, making 3,761 shares in all. These the plaintiff was to accept and not to sell for six months; the rest of the B-shares the defendant would account for later. If the unsold A-shares brought more than $40, the defendant would make up the difference; if less, the plaintiff. The plaintiff got the prescribed shares, and at the end of six months, being in need of money for a new venture, began to sell them on the market. The defendant, learning of this, wrote him that if he kept on, it would no longer support the market as it had been doing. After some negotiation the parties concluded the second and final settlement on October 11, 1929, by which the defendant took the remainder of the plaintiff's A-shares, 2,561, at $34, and all obligations between the parties were released. This completed the accord and satisfaction.

The suit is based upon the theory that the defendant stood in a fiduciary relation to plaintiff, but the issue seems to us immaterial. Having undertaken to state the account of its transactions in the shares, it was bound to state them truly, fiduciary or not; it had said that the 66,433 shares had been sold at $44.50, and the agreement cannot stand if that was substantially untrue. Conversely, if the statement was true, the plaintiff must lose, for the defendant might settle with him, even though a fiduciary, provided it truly disclosed all material facts. The challenge is to the number of shares sold and to the price in the case of 17,325 of them. The defendant reached the number 66,433, by deducting from 90,025 two items; 22,537 and 1,055. The first was the unsold balance of its subscription of 40,000 which it merely charged back upon its books; the second were shares taken off the market in order to support the price. The more important of the two is the first, and its correctness turns upon what the parties meant when they limited the amount to be divided between them to "originating profits," and yet allowed the defendant to become a member of the "banking" and "selling groups." If the defendant must have announced itself as a member of either group, thus becoming bound to the other members of that group as they became bound to it by their subscriptions, it never became a member of the "banking group" at all. The subscription entered on its books, assuming that the employee who made it was authorized to do so, it never communicated to the other members, and it certainly was not bound to them. If there was no "originating profit" unless it was so bound, the defendant was liable for a profit upon 17,463 shares sold by it, not at $44.50, but at whatever it got, for these shares were not in that case sold under the underwriting at all. This the plaintiff does not assert, and wisely, for it would not be tenable. The defendant was manager of the underwriting and the natural meaning of the contract was that it might enter itself in any group in the way customary in such flotations. So far as appears, managers may make a subscription which does not bind them. On the other hand, if the contract only meant that the defendant might become a member by merely writing a subscription on its books, it may be argued with some plausibility that, at least for the purpose of the contract, that ought to be taken as a definitive election to underwrite to that amount. We think not, for if so, the defendant would be charged with an unreal profit; and certainly the parties meant to share actual, not paper, profits. Taking the contract as a whole, we hold that the defendant was to be permitted to limit the actual profits by treating itself as a member of the "banking group" to such an extent as it chose. This did indeed put the plaintiff in its hands, but that was not unfair. As to other members of the "banking group," the clause was unnecessary anyway for actual and "originating" profits were inevitably the same; the defendant could get nothing but the $44.50, for which the underwriter accounted to it. If, however, it sold shares itself, it would be clearly unfair to treat what it got as all profit; for it included those services for which the other two groups were to receive $3.50. The only purpose which we can impute to the reservation of a right to become a member of the other groups was therefore to allow it to sell shares as it pleased at a stipulated profit of $44.50; the plaintiff's profits were "stopped" at that amount, at least so far as the shares were sold as part of this underwriting at all. Consequently the defendant was not bound to account for the unsold shares.

The other deduction, that of the 1,055 shares which were taken off the market, was not proper, for it was a banking group liability; but it was more than made up by the inclusion of 1,200 shares for which one of the underwriters, Baillargeon, Winslow & Co., had subscribed, and from taking up which they were excused because their expected customers had been taken from them by other

sellers; though they were indeed allowed their commissions upon all shares subscribed for. The book entries were very confused, but the undisputed testimony is that the underwriter was forgiven so much of the subscriptions, and probably the deduction was not included in the settlement only because it had not yet been made. As to the defendant's power to excuse an underwriter for such a reason, it would be a very strict interpretation of the contract which should forbid it to allow any but legal excuses. If it was willing to forego its profit for the sake of its relations with the complaining member, and if it acted in good faith towards the plaintiff, it appears to us that the release was within the measure of its implied powers. For this reason we think that the plaintiff may complain of neither deduction, and that 66,433 shares was the proper amount to include in the settlement.

The price at which the 10,825 shares and the 6,500 shares were brought into the settlement raises other questions. We assume in accordance with our understanding of the contract, that the defendant could at any time treat sales which were part of the underwriting, as falling within its original subscription of 40,000, and could thus have limited the profit to $44.50. Its books did not indeed so treat these sales, though there is some reason to suspect that as to 10,825 this was a mistake. But we are not concerned with the books when considering the settlement. The defendant had lawful power by merely writing proper entries to limit the profit between the parties; it chose so to limit it when making up the figures for the settlement, and the plaintiff had no interest in the correspondence of the books with these figures, the whole matter resting in the defendant's hands as it did. The provision that actual profits should in some cases be taken, was intended we think only for sales made after the underwriting was over, or for such as could not fall within it. Of the last kind were first the 6,500 shares sold at $45 to three persons, towards whom the defendant apparently stood as a fiduciary. Since the selling price for these was made ad hoc, they must be regarded as transactions quite outside the underwriting. The difference is $3,250, of which the plaintiff's one-fifth is $650. Again, it appears to us that of the 10,825 shares sold at $46 the 6,900 shares should not have been placed within the underwriting, which were taken up by the old Dresser shareholders. It is true that they did not accept these shares until December 10, three days after the underwriting was opened, and that they were subjected to some of the limitations

of the selling group. But, although nothing of the sort was incorporated into the written contract by which they sold the old shares, the defendant acknowledged on December fourth that it had agreed with them that they should be entitled to the new shares up to the extent of one-fourth of the proceeds of their old holdings. They had a prior right to the shares, though the terms were not fully decided. It was therefore not proper or possible to attribute their purchases made to take up their options, as secured through the underwriting, which must have been understood to be limited to those who should be induced to buy after it was opened. This makes a difference of $10,350 of which the plaintiff's share is $2,070; the two items together come to $2,695, and to this extent alone do we find any error in the first settlement.

We can find neither error nor oppression in the second. It is true that the sum reserved to pay the income taxes of the old Dresser shareholders turned out to be much greater than was necessary, but the defendant did not yet know how much of it would be required, for the taxes were not finally adjusted until 1931. The plaintiff also knew that the matter was still open, and he had been advised in the first settlement to the cent of the amount reserved. Thus in October, 1929, he knew that he was releasing an uncertain claim, and the defendant knew no more; the parties were on a parity. This was the only matter as to which there is even a claim of suppression on the final settlement. The claim of duress is a curious fantasy; it rests upon the defendant's unwillingness to support the market until the plaintiff should unload all his remaining A-shares. The threat to do so is put forward as an unlawful pressure upon the plaintiff. The defendant had done nothing, nor did it threaten to do anything; it had merely refused any longer to suckle the plaintiff's investments. Not even a fiduciary is obliged to stand wet nurse. It is true that the final adjustment of their relations depended upon the prices at which the shares, both A and B, should be sold, and the defendant, if a fiduciary as we are assuming, could not perhaps lawfully drive down their value. But it requires much hardihood to argue that there was a positive duty to give the securities of a cestui que trust a factitious value; and indeed, even though that were granted, the plaintiff was merely in need of funds to invest elsewhere. Such a predicament is a curious kind of duress.

Therefore we find that the plaintiff has no complaint except to the extent of $2,695. To

correct this error we need not reopen the accord and satisfaction; not by the slightest chance could the plaintiff have refused to settle, had he learned that he was entitled to that much more than he was receiving. Full equity will be done if a decree be entered for the amount due with interest from the beginning of this suit, that being as we understand it, the first demand.

Decree modified by granting the plaintiff judgment for $2,695 with interest from the filing of the bill, and otherwise affirmed. No costs.